# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re Subpoena of Hyundai Heavy Industries Co., Ltd. | Case No. ___2:25-mc-00051___ |
| | |
| *UNDERLYING CASE:* | |
| In the Matter of the Petition | |
| of | |
| GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI, | Case No. 24-cv-00941-JKB (D. Md.) |
| and | Honorable James K. Bredar |
| SYNERGY MARINE PTE LTD, as Manager of the M/V DALI, | |
| for Exoneration from or Limitation of Liability. | |

## MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY HD HHI'S MOTION TO QUASH THE SUBPOENA TO TESTIFY AT A DEPOSITION

## TABLE OF CONTENTS

BACKGROUND ...........................................................................................................3

    A.    The 2002 Pennsylvania Foreign Business Corporation Registration .....................3

    B.    Hyundai Heavy Industries Co., Ltd.'s Corporate Reorganizations .........................4

    C.    Construction Of The M/V *Dali* And Related Arbitration
        Contracts/Agreements ...........................................................................................6

    D.    The Allision And The LoL Action.........................................................................8

    E.    Petitioners' Recently Filed Lawsuit Against HD HHI ..........................................10

ARGUMENT ............................................................................................................10

I.    This Court Does Not Have Personal Jurisdiction Over HD HHI .....................................10

    A.    This Court Lacks General And Specific Personal Jurisdiction
        Over HD HHI........................................................................................................11

    B.    HD HHI Has Not Consented To Personal Jurisdiction In Pennsylvania ..............13

    C.    Pennsylvania's Consent Requirement Violates The Dormant
        Commerce Clause .................................................................................................18

II.    The Subpoena Does Not Comply With Rule 45's Territorial Limitations ........................20

III.    The Subpoena Is An Improper Effort To Circumvent The Hague Convention................21

IV.    The Subpoena Should Be Quashed Based On Its Improper Purpose And
    Other Prudential Considerations .................................................................................23

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aldossari ex rel. Aldossari v. Ripp,*
    49 F.4th 236 (3d Cir. 2022) ................................................11

*Amoco Egypt Oil Company v. Leonis Navigation Company,*
    1 F.3d 848 (9th Cir. 1993) ................................................14

*Arcelik A.S. v. E.I. DuPont de Nemours & Company,*
    856 F. App'x 392 (3d Cir. 2021) ................................................22

*In re Automotive Refinishing Paint Antitrust Litigation,*
    229 F.R.D. 482 (E.D. Pa. 2005)................................................10

*Bacchus Imports, Ltd. v. Dias,*
    468 U.S. 263 (1984)................................................19

*Bayou Steel Corporation v. M/V Amstelvoorn,*
    809 F.2d 1147 (5th Cir. 1987) ................................................11

*Burger King Corporation v. Rudzewicz,*
    471 U.S. 462 (1985)................................................13, 18

*Calhoun v. Yamaha Motor Corporation,*
    216 F.3d 338 (3d Cir. 2000)................................................24

*Complaint of Consolidation Coal Company,*
    123 F.3d 126 (3d Cir. 1997)................................................8

*Department of Revenue of Kentucky v. Davis,*
    553 U.S. 328 (2008)................................................19

*El Paso Production GOM v. Smith,*
    2005 WL 167588 (E.D. La. Jan. 25, 2005)................................................12

*Fischer v. Federal Express Corporation,*
    42 F.4th 366 (3d Cir. 2022) ................................................11

*Fisher v. Teva PFC SRL,*
    212 F. App'x 72 (3d Cir. 2006) ................................................14

*Ford Motor Company v. Montana Eighth Judicial District Court,*
    592 U.S. 351 (2021)................................................11, 12

*Gap, Inc. v. Stone International Trading, Inc.*,
   1994 WL 38651 (S.D.N.Y. Feb. 4, 1994)...........................................................22

*General Electric Company v. Deutz AG*,
   270 F.3d 144 (3d Cir. 2001)...............................................................................18

*Gucci America, Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)...............................................................................10

*Harry F. Ortlip Company v. George Hyman Construction Company*,
   126 F.R.D. 494 (E.D. Pa. 1989).........................................................................23

*Hasson v. FullStory, Inc.*,
   114 F.4th 181 (3d Cir. 2024) .............................................................................11

*Hermitage Global Partners LP v. Prevezon Holdings Ltd.*,
   2015 WL 728463 (S.D.N.Y. Feb. 19, 2015)........................................................21

*Ingenico Inc. v. Ioengine, LLC*,
   2021 WL 765757 (D. Del. Feb. 26, 2021) ..........................................................22

*Jean-Paul Weg LLC v. Director of New Jersey Division of Alcoholic Beverage Control*,
   133 F.4th 227 (3d Cir. 2025) .............................................................................18

*Laker Airways Ltd. v. Pan American World Airways*,
   607 F. Supp. 324 (S.D.N.Y. 1985) .....................................................................21

*In re Libel & Petition of Gemini Navigation, S.A.*,
   1996 WL 544236 (S.D. Tex. Mar. 1, 1996)........................................................12

*Mallory v. Norfolk Southern Railway Company*,
   600 U.S. 122 (2023)..................................................................................*passim*

*Marks v. United States*,
   430 U.S. 188 (1977)...........................................................................................15

*In re Moose Enterprises Pty. Ltd.*,
   2016 WL 10987320 (C.D. Cal. June 2, 2016) ....................................................21

*In re Mushroom Direct Purchaser Antitrust Litigation*,
   2009 WL 10736425 (E.D. Pa. Dec. 4, 2009) ......................................................23

*National Pork Producers Council v. Ross*,
   598 U.S. 356 (2023)...........................................................................................19

*Oppenheimer Fund, Inc. v. Sanders*,
   437 U.S. 340 (1978)...........................................................................................23

*Orange Theatre Corporation v. Rayherstz Amusement Corporation*,
    139 F.2d 871 (3d Cir. 1944) (en banc)......................................................................1

*Palcko v. Airborne Express, Inc.*,
    372 F.3d 588 (3d Cir. 2004)...................................................................................1

*Pennsylvania Fire Insurance Company of Philadelphia v. Gold Issue Mining &
    Milling Company*,
    243 U.S. 93 (1917)...............................................................................................15

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).............................................................................................19

*Price Waterhouse LLP v. First American Corporation*,
    182 F.R.D. 56 (S.D.N.Y. 1998)...........................................................................21

*Seaton Insurance Company v. Cavell USA*,
    2007 WL 9657277 (D. Conn. Mar. 21, 2007) .....................................................21

*Societe Nationale Industrielle Aerospatiale v. United States District Court for
    Souther District of Iowa*,
    482 U.S. 522 (1987).............................................................................................22

*Tennessee Wine & Spirits Retailers Association v. Thomas*,
    588 U.S. 504 (2019).............................................................................................18

*United States Catholic Conference v. Abortion Rights Mobilization, Inc.*,
    487 U.S. 72 (1988)...............................................................................................10

**Federal Statutes and Rules**

28 U.S.C. § 1391.........................................................................................................20

46 U.S.C. § 30501.........................................................................................................8

46 U.S.C. § 30523.........................................................................................................8

Fed. R. Civ. P. 26.......................................................................................................24

Fed. R. Civ. P. 30.........................................................................................................9

Fed. R. Civ. P. 45 ............................................................................................. *passim*

**State Statutes**

15 Pa. Cons. Stat. § 146.............................................................................................17

42 Pa. Cons. Stat. § 5301...........................................................................................13

42 Pa. Cons. Stat. § 5322 ..................................................................................................11

**Other Authorities**

70 Am. Jur. 2d Shipping § 385 ..........................................................................................8

*Annual Reports in Pennsylvania*, Commonwealth of Pennsylvania,
    https://www.pa.gov/agencies/dos/programs/business/types-of-filings-and-
    registrations/annual-reports (last visited Aug. 22, 2025)........................................17

*Grace Ocean Private Ltd. v. Hyundai Heavy Industries Company, Ltd.*,
    No. 2:25-cv-04374 (E.D. Pa. July 31, 2025) ....................................................1, 10

*In the Matter of the Petition of Grace Ocean Private Ltd., et al. for Exoneration
    from or Limitation of Liability*,
    No. 24-cv-00941 (D. Md.) ................................................................. *passim*

Non-Party HD Hyundai Heavy Industries, Co., Ltd. ("HD HHI") hereby submits this Memorandum of Law in support of its Motion to Quash.  The July 16, 2025 subpoena commanding HD HHI to appear and testify at a deposition (the "Subpoena") was issued by the United States District Court for the District of Maryland in connection with *In the Matter of the Petition of Grace Ocean Private Ltd., et al. for Exoneration from or Limitation of Liability*, No. 24-cv-00941 (hereinafter, the "LoL Action") on behalf of Grace Ocean Private Limited and Synergy Marine Pte Ltd. (together, "Petitioners").  It commands compliance in the Eastern District of Pennsylvania.[1]  The United States District Court for the Eastern District of Pennsylvania therefore is the proper forum for this motion under Fed. R. Civ. P. 45(d)(3)(A).

## PRELIMINARY STATEMENT

Grace Ocean and Synergy are the owner and manager, respectively, of the M/V *Dali*, a container ship built by HD HHI in South Korea in 2014.  After 10 years of traversing the globe, on March 26, 2024, the ship Petitioners have owned and operated since 2016 struck the Francis Scott Key Bridge in Baltimore, Maryland, killing six people and causing billions of dollars in damage.  Shortly after the allision, Petitioners initiated a Limitation of Liability proceeding, a maritime proceeding that would allow them to attempt to avoid responsibility for these damages. On July 31, 2025, Petitioners filed a lawsuit against "Hyundai Heavy Industries Co., Ltd." hoping to shift liability for their irresponsible operation of the ship to HD HHI.  *See* Complaint,

---

[1]    HD HHI's appearance in this court is solely for the purpose of moving to quash the Subpoena, without consenting to this Court's jurisdiction or waiving any argument regarding the lack thereof.  *See Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 874-75 (3d Cir. 1944) (en banc).  HD HHI's appearance is likewise without waiver of any right to seek to compel arbitration with Petitioners with respect to any claim.  *See Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 596-98 (3d Cir. 2004).

*Grace Ocean Priv. Ltd. v. Hyundai Heavy Indus. Co., Ltd.*, No. 2:25-cv-04374 (E.D. Pa. July 31, 2025) (the "Complaint").

The Subpoena at issue here was served on July 16—just two weeks before Petitioners filed their Complaint.  It purports to command Hyundai Heavy Industries Co., Ltd. to send a corporate designee from South Korea and sit for a deposition to provide testimony in Philadelphia, a place where HD HHI conducts no business and has no corporate presence.

The Subpoena is improper and should be quashed for four independent reasons.  *First*, neither this Court nor the United States District Court for the District of Maryland has personal jurisdiction over HD HHI.  HD HHI is not headquartered in Pennsylvania, does not have its principal place of business there, and has not availed itself of Pennsylvania's jurisdiction.  All of its actions in connection with the M/V *Dali* (namely, building the ship) took place in South Korea.  The only possible ground for asserting personal jurisdiction over HD HHI in Pennsylvania is a long-forgotten corporate registration filed by a predecessor entity over 23 years ago.  Basing jurisdiction on this thin reed violates the requirements of the Due Process Clause and the dormant Commerce Clause, which constrain this Court's exercise of personal jurisdiction.

*Second*, the Subpoena seeks to compel attendance at a deposition beyond the geographic limits imposed by Fed. R. Civ. P. 45(c)(1).  Even if there were personal jurisdiction over HD HHI in Pennsylvania, that fact alone does not permit Petitioners to compel a non-party to comply with a subpoena beyond the scope of what is permitted by Rule 45.

*Third*, the Subpoena improperly attempts to circumvent the Hague Convention.  HD HHI does not dispute that, as the builder of the M/V *Dali*, it possesses some discoverable information about the proper maintenance and functioning of the ship that may be relevant to the LoL Action.

It has already provided significant third-party discovery in response to properly served Hague requests made by other parties in that proceeding and is currently preparing to provide more. These prior discovery requests have all recognized the jurisdictional barriers to obtaining discovery from HD HHI via a Rule 45 subpoena and have instead been pursued, as they should be, via the Letter of Request process contemplated by the Hague Convention.  HD HHI stands ready to engage with Petitioners in this process.  Instead of following those rules, Petitioners are attempting an end run around them.

And, *fourth*, the Subpoena raises significant jurisdictional, venue, choice-of-law, and substantive questions that are more appropriately resolved directly in the proceeding Petitioners have initiated through their Complaint, rather than in this miscellaneous action.

The Subpoena should be quashed, and Petitioners should pursue any third-party discovery from HD HHI via the correct process for seeking discovery from a South Korea-based foreign corporation.

## BACKGROUND

### A.    The 2002 Pennsylvania Foreign Business Corporation Registration

Petitioners' assertion of personal jurisdiction appears to rest on an unused corporate registration associated with the entity "Hyundai Heavy Industries Co., Ltd." dated 2002 and Petitioners' purported service of the Subpoena on that same entity through a registered agent in Pennsylvania.  *See* Kim Decl. ¶ 22.  Prior to Petitioners' purported service, HD HHI was unaware of the existence of any corporate registration of any related entity in Pennsylvania.  *Id.* ¶ 21.  Following the purported service, HD HHI investigated the circumstances under which the unused registration was filed and learned the following facts.  *Id.* ¶¶ 23-27.

In 2002, Yong Bae Kwon—a senior vice president in Hyundai Heavy Industries Co., Ltd.'s Offshore Plant Division—submitted an Application for Certificate of Authority that

purported to register Hyundai Heavy Industries Co., Ltd. as a Foreign Business Corporation with the Pennsylvania Secretary of State. Kim Decl. ¶¶ 28-29. Mr. Kwon retired from full-time employment at Hyundai Heavy Industries Co., Ltd. in 2006 and has not performed any work for the company since 2007. *Id.* ¶ 27. Mr. Kwon has no memory of signing or submitting this form and does not know why it was submitted. *Id.* ¶ 29. Mr. Kwon's work did not involve any work or business related to the United States generally or to Pennsylvania specifically. *Id.*

After a diligent search, HD HHI has not identified any documents or information explaining why the registration form was submitted. Kim Decl. ¶ 26. Nor has it identified anyone employed at HD HHI who was aware of the unused registration prior to the purported service. *Id.* HD HHI has not, to the knowledge of anyone employed at the company or on the basis of any documentation that it has been able to locate, ever acted or put itself forward as a Pennsylvania-registered corporation (for the purposes of doing business in Pennsylvania or otherwise). *Id.* Nor has the company been able to identify any potential business or purpose for which the registration might have been filed with the Pennsylvania Secretary of State in 2002, or any business at any point thereafter that would have required such a registration. *Id.* To the best of HD HHI's current understanding, this registration—if still valid—does not belong to HD HHI and is instead owned by the entity that succeeded to all residual rights and obligations of the predecessor Hyundai Heavy Industries Co., Ltd through the 2019 transaction discussed below.

**B.    Hyundai Heavy Industries Co., Ltd.'s Corporate Reorganizations**

Hyundai Heavy Industries Co., Ltd. has undergone significant corporate restructuring between 2002 and 2025. From 2002 to 2017, Hyundai Heavy Industries Co., Ltd. was a conglomerate housing many different lines of businesses. *See* Kim Decl. ¶¶ 7-8. These included, among others, the shipbuilding and maritime-equipment department; the robotics

department; the electric-equipment department; and the construction and heavy-equipment department.  *See id.* ¶ 7; Ex. A.

In 2017, Hyundai Heavy Industries Co., Ltd. underwent a corporate reorganization. Through a demerger transaction, three new corporate entities were created, and Hyundai Heavy Industries Co., Ltd.'s businesses were divided among the consequent four separate and legally distinct corporations (including Hyundai Heavy Industries Co., Ltd.), with each corporate entity inheriting a different component of the former company's business, along with the burdens and obligations attendant thereto.  *See* Kim Decl. ¶¶ 8-9; Ex. A.  Hyundai Heavy Industries Co., Ltd.—despite inheriting the name of the former umbrella corporation—took on only the shipbuilding and maritime divisions of the business (along with some smaller miscellaneous divisions).  *See* Kim Decl. ¶ 11; Ex. A.

In 2019, Hyundai Heavy Industries Co., Ltd. was divided again, separating its assets into two separate and legally distinct companies.  As a part of that transaction, the preexisting corporate entity changed its name to "Korea Shipbuilding & Offshore Engineering Co., Ltd." ("KSOE").  *See* Kim Decl. ¶ 17; Ex. C at 1.  A new corporation was created as a subsidiary of KSOE and that subsidiary took the name "Hyundai Heavy Industries Co., Ltd."  *See* Kim Decl. ¶¶ 17-18; Ex. C § 2, ¶ 1.  This newly incorporated Hyundai Heavy Industries Co., Ltd. (the New Company) inherited only the shipbuilding, special vessels, offshore and industrial-plant engineering, and engine-machinery operations, while KSOE (the Surviving Company f/k/a Hyundai Heavy Industries Co., Ltd) was allocated residual rights to "all assets, rights, and obligations" other those associated with businesses belonging to the New Company.  *See* Kim Decl. ¶ 19; Ex. C § 2, ¶ 5.  In 2023, Hyundai Heavy Industries Co., Ltd. (the company created in

2019) was renamed "HD Hyundai Heavy Industries Co., Ltd." *See* Kim Decl. ¶ 20. The following chart summarizes the corporate restructurings described above.



### C.    Construction Of The M/V *Dali* And Related Arbitration Contracts/Agreements

Between 2013 and 2021, HD HHI (or its predecessor companies) signed a series of agreements with Grace Ocean and/or Synergy (or their predecessors in interest).

In connection with building the M/V *Dali*, Hyundai Heavy Industries Co., Ltd. and Stellar Marine LLC executed a contract in May 2013 governing construction and delivery of the vessel, as well as any warranties, defects, or liabilities (the "Shipbuilding Contract"). *See* Kim Decl. ¶ 33; Ex. E. The Shipbuilding Contract includes a clause providing that "[i]f any dispute or difference shall arise between the parties hereto concerning any matter or thing herein contained, or the operation or construction thereof, or any matter or thing in any way connected with [the Shipbuilding Contract] or the rights, duties or liabilities of either party under or in connection with [the Shipbuilding Contract], then, in every such case, the dispute or difference shall be referred to arbitration in London, England." Kim Decl. ¶ 33; Ex. E at 50. The Shipbuilding Contract further provides that "[a]ny arbitration arising hereunder shall be governed by and construed in accordance with the Arbitration Act 1996 of England or any statutory modification or re-enactments thereof for the time being in force and with the rules of

the London Maritime Arbitrator's Association for the time being in force" and that "the validity and interpretation of [the Shipbuilding Contract] and of each Article and part thereof shall be governed by the laws of England." *See* Kim Decl. ¶ 33; Ex. E at 50, 57.

The shipbuilding arm of Hyundai Heavy Industries Co., Ltd. began construction on the M/V *Dali* in 2014 in Ulsan, South Korea. *See* Kim Decl. ¶¶ 33-34. The vessel was delivered in January 2015 to Stellar Marine LLC, a subsidiary of the Greek shipowner Oceanbulk Maritime S.A., and the M/V *Dali* was registered in the Marshall Islands. *See id.* ¶ 34.

In September 2016, the ownership of the M/V *Dali* was transferred from Stellar Marine LLC to Grace Ocean. At the time, Hyundai Heavy Industries Co., Ltd., Stellar Marine LLC, Lepta Shipping Co., Ltd., and Grace Ocean also entered into an agreement (the "Quadripartite Assignment Agreement") to clarify the assignment of rights among the four parties, including those in the Shipbuilding Contract. Consistent with the Shipbuilding Contract, the Quadripartite Assignment Agreement likewise provided that the agreement "shall be governed by and constructed in accordance with English law and any dispute arising out of or in connection with [the Quadripartite Assignment Agreement] shall be referred to arbitration in London." Kim Decl. ¶ 36; Ex. F. ¶ 8.

The Shipbuilding Contract also included a warranty provision, which allowed the buyer of the ship to submit any warranty claims for a period of 12 months from the date of delivery. *See* Kim Decl. ¶ 33; Ex. E at 33. Without conceding liability as to any such claims, in October 2021, Grace Ocean, Synergy, and Hyundai Heavy Industries Co., Ltd. executed a Settlement Agreement to settle "any and all claims and disputes" related to the warranty. *See* Kim Decl. ¶¶ 33, 37; Ex. G ¶ 1. The Settlement Agreement also stated that the "governing law and

arbitration clauses contained in the Shipbuilding Contract shall also apply to this Settlement Agreement." Kim Decl. ¶ 37; Ex. G ¶ 5.

### D.    The Allision And The LoL Action

At about 1:30 a.m. on March 26, 2024, the M/V *Dali* was departing the Port of Baltimore towards Sri Lanka when it struck a support tower of the Francis Scott Key Bridge in Baltimore, Maryland, causing the bridge to collapse into the Patapsco River. LoL Action, Dkt. 567 at 1-2, 5. Six members of a maintenance crew working on the roadway of the Francis Scott Key Bridge were killed, two others were injured, and the collapsed bridge blocked access to most of the Port of Baltimore, causing significant financial harm. *Id.* at 2.

On April 1, 2024, Petitioners initiated the LoL Action in the U.S. District Court for the District of Maryland, seeking to limit their liability for the allision under 46 U.S.C. § 30501 *et seq.* The LoL Action will proceed in two phases. LoL Action, Dkt. 438. In Phase One, the court will determine whether Petitioners caused the allision. If they did not, then they will be exonerated from all liability. If they did, but the shipowners are found to have been without "privity or knowledge"—a term of art meaning culpable participation in causing the accident through negligent acts or knowledge of unseaworthy conditions, *see* 70 Am. Jur. 2d Shipping § 385; *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 132 (3d Cir. 1997)—then their liability will be limited to a fund of $43 million. If, however, the shipowners caused the allision and are found to have had "privity or knowledge" of the negligence or unseaworthiness, they will be liable for the damage caused by the allision, which may exceed a billion dollars. *See* 46 U.S.C. § 30523; LoL Action, Dkt. 157.

The court ruled that it would confine its determinations in Phase One to those determinations "necessary to resolving whether Petitioners [and only Petitioners] are entitled to exoneration from or limitation of liability," while allowing broader discovery subject to the time

constraints of the case schedule (and the Federal Rules of Civil Procedure). LoL Action, Dkt. No. 438 at 1. In Phase Two, the court will decide any issue that remains, including as necessary allocating damages among the various claimants, including the State of Maryland and the families of the victims. *Id.* The LoL Action is currently in Phase One. Fact discovery for this phase is scheduled to close on August 29, 2025, although Petitioners and the State of Maryland have requested leave to conduct a deposition of HD HHI in South Korea after that date. LoL Action, Dkt. No. 593. HD HHI is in discussions with the parties to the LoL Action regarding providing a witness for a deposition after the deadline for the close of Phase One discovery has passed, provided that such a deposition is sought through the Hague Convention. *See* LoL Action, Dkt. No. 600.

Earlier this year, the State of Maryland, a claimant in the LoL Action, pursued non-party discovery from HD HHI. It did so by filing a motion seeking a Letter of Request pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. LoL Action, Dkt. No. 468, 468-1. The court granted the motion on January 23, 2025. LoL Action, Dkt. No. 471; *see also* LoL Action, Dkt. No. 472. HD HHI produced responsive documents to Maryland (which reproduced them to all other parties, including Petitioners) beginning in January 2025. On July 31, 2025, Maryland initiated the Hague process for a second time to seek a Rule 30(b)(6) deposition by written question of HD HHI, again moving for a Letter of Request. LoL Action, Dkt. No. 584.

On July 16, 2025, Petitioners attempted to effect service of two subpoenas on HD HHI by serving the subpoenas on "Hyundai Heavy Industries Co., Ltd. c/o Registered Agent Corporation Service Company" at 5235 North Front Street, Harrisburg, PA 17110. One of the subpoenas, a

Subpoena to Testify at a Deposition to be taken at the offices of the law firm Blank Rome LLP in

Pennsylvania, is the subject of this Motion.[2]

### E.    Petitioners' Recently Filed Lawsuit Against HD HHI

On July 31, 2025, Petitioners filed a complaint in the Eastern District of Pennsylvania

against "Hyundai Heavy Industries Co., Ltd."  *See* Complaint, *Grace Ocean Priv. Ltd. v.*

*Hyundai Heavy Indus. Co., Ltd.*, No. 2:25-cv-04374 (E.D. Pa. July 31, 2025).  The Complaint

alleges claims based on strict products liability, breach of implied warranties, negligent

misrepresentation, negligence, and indemnity or contribution, premised on a theory that the M/V

*Dali* was delivered with a loose wire in one of the switchboards that went undiscovered for ten

years but then caused the power outage that preceded the allision.  On August 1, 2025,

Petitioners purported to serve that Complaint in a manner similar to how they served the

Subpoena.

### ARGUMENT

### I.    This Court Does Not Have Personal Jurisdiction Over HD HHI

The Subpoena should be quashed because this Court lacks personal jurisdiction over HD

HHI.  "Federal Rule of Civil Procedure 45 grants a district court the power to issue subpoenas as

to witnesses and documents, but the subpoena power of a court cannot be more extensive than its

jurisdiction."  *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988).  Thus,

a district court "must have personal jurisdiction over a nonparty in order to compel it to comply

with a valid discovery request under Federal Rule of Civil Procedure 45."  *Gucci Am., Inc. v.*

*Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014); *accord In re Auto. Refinishing Paint Antitrust*

---

[2]    The other subpoena seeks production of documents with a place of compliance in
Washington, D.C.  HD HHI is responding to that subpoena as required by Rule 45, including by
contesting personal jurisdiction over HD HHI.

*Litig.*, 229 F.R.D. 482, 487 (E.D. Pa. 2005) ("A federal court must have personal jurisdiction over a nonparty witness in order to compel it to comply with a valid discovery request.").

A federal district court may assert personal jurisdiction over a nonresident of the forum State "to the extent permitted by the law of the forum state." *Hasson v. FullStory, Inc.*, 114 F.4th 181, 186 (3d Cir. 2024); *see Fischer v. Fed. Express Corp.*, 42 F.4th 366, 382-83 (3d Cir. 2022). Because Pennsylvania's long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States," 42 Pa. Cons. Stat. § 5322(b), Pennsylvania courts look to the minimum requirements for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment, *see Aldossari ex rel. Aldossari v. Ripp*, 49 F.4th 236, 257 (3d Cir. 2022); *see also Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d 1147, 1150 (5th Cir. 1987) ("Notwithstanding the admiralty setting, the due process standard of the fourteenth amendment is applicable."). The Supreme Court has "recogniz[ed] two kinds of personal jurisdiction" as consistent with due process's requirements: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Here, there is neither.

**A.    This Court Lacks General And Specific Personal Jurisdiction Over HD HHI**

A court may exercise general personal jurisdiction only when a defendant is "essentially at home" in the forum State. *Ford*, 592 U.S. at 358. Corporations are "at home" in two places: their State of incorporation and their principal place of business. *Id.* at 358-59. For HD HHI, Pennsylvania is neither. *See* Kim Decl. ¶ 5. Indeed, no court in the United States may assert general personal jurisdiction over HD HHI because its headquarters and principal place of business are in South Korea. *See id.* ¶¶ 3, 5.

11

To be subject to specific personal jurisdiction, the non-party recipient of a discovery request "must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Ford*, 592 U.S. at 359 (cleaned up).  In addition, the assertion of jurisdiction "must arise out of or relate to the [non-party's] contacts with the forum." *Id.* (cleaned up).  This test is not satisfied here.  The M/V *Dali* was constructed in South Korea and sold to a buyer in the Marshall Islands; it was then purchased by a Singaporean entity and operated by a different Singaporean entity.  The vessel came to the United States without any involvement of HD HHI, solely as a result of how the vessel's owners and operators have operated their businesses.  HD HHI had nothing to do with the vessel's travels—it was not informed of the M/V *Dali*'s visits to U.S. ports or U.S. waters and had no ability to control or direct the M/V *Dali*'s operations, routes, or destinations.  To the extent Petitioners seek to premise jurisdiction on the allision, an event in which HD HHI played no role, that incident occurred in Maryland, not in Pennsylvania.

On these facts, HD HHI cannot be said to have purposefully directed any activities at Pennsylvania that establish personal jurisdiction.  *Cf. El Paso Prod. GOM v. Smith*, 2005 WL 167588, at *4-5 (E.D. La. Jan. 25, 2005) (finding specific personal jurisdiction in Louisiana over defendants, who were owner and operator of a tug involved in allision, where the allision occurred in Louisiana, defendants had brought the tug to Louisiana in preparation for its voyage, defendants' other vessels made several port calls a year to Louisiana, defendants' vessels made crew changes in Louisiana, defendants entered into contracts with Louisiana entities, and defendants provided goods and services to Louisiana entities); *In re Libel & Petition of Gemini Navigation, S.A.*, 1996 WL 544236, at *4 (S.D. Tex. Mar. 1, 1996) (exercising personal jurisdiction over operator of vessel involved in allision was "in keeping with our notions of fair

play" where operator "has attempted to conduct a major shipping business in the United States, much of it conducted in Texas" by "continuously and systematically shipping grain and other goods from Texas ports").

**B.    HD HHI Has Not Consented To Personal Jurisdiction In Pennsylvania**

Petitioners may seek to establish personal jurisdiction in this Court through HD HHI's purported consent; that would be baseless.  Corporations may—in certain circumstances— consent to personal jurisdiction.  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 146 n.11 (2023) (plurality opinion); *id.* at 152 (Alito, J., concurring in part and concurring in the judgment).  One way that this consent may be obtained is through state laws requiring that foreign (*i.e.*, out-of-state) companies agree to be subject to suit in state courts as part of registering to do business in the state.  *Id.* at 130 (plurality opinion).  Pennsylvania has one of the broadest jurisdiction-by-registration statutes.  *Id.* at 127, 130; 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b).  Petitioners may point to the fact that a predecessor entity to HD HHI registered as a Foreign Business in 2002 as evidence that HD HHI has consented to jurisdiction.  *See* Kim Decl. ¶ 22.  The Court should reject this argument.

A 23-year-old unused registration by a predecessor entity, unaccompanied by evidence of any subsequent actual business in Pennsylvania, is insufficient to establish HD HHI's consent to personal jurisdiction for the purposes of a 2025 subpoena issued in connection with a Maryland litigation to which neither HD HHI nor its predecessor is a party.  Assertions of jurisdiction based on registration statutes must still comport with principles of "fair play and substantial justice" in order to comply with the Due Process Clause.  *See Mallory*, 600 U.S. at 143 (plurality opinion); *id.* at 153 (Alito, J., concurring in part and concurring in the judgment); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (explaining that "the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if" the other

requisites for personal jurisdiction are satisfied).  Courts will decline to assert personal

jurisdiction where doing so would violate these fundamental constraints.  *See, e.g.*, *Amoco Egypt*

*Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851-53 (9th Cir. 1993) (even if defendant in

allision lawsuit had minimum contacts with Washington, "the exercise of personal jurisdiction

over [defendant] would be unreasonable" where defendant's "base of operations [wa]s in

Manila," defendant "ha[d] no connections with Washington," "[t]he vessel involved in the

accident was not sailing from Washington and carried no Washington cargo," and "an alternative

forum for [plaintiff's] claim against [defendant] plainly exist[ed]"); *Fisher v. Teva PFC SRL*, 212

F. App'x 72, 77 (3d Cir. 2006) (explaining that "even if sufficient contacts existed, exercising

personal jurisdiction over the defendant would be unreasonable" and contrary to "traditional

notions of fair play and substantial justice" where the burden placed on defendant was great, the

forum State had little interest in the lawsuit, and plaintiffs did not have great interest in obtaining

relief in the forum State).

    *Mallory v. Norfolk Southern Railway Co.* is the Supreme Court's most recent decision

addressing consent-by-registration statutes.  There, the plaintiff sued his former employer

Norfolk Southern in Pennsylvania state court, alleging that his work for the railroad caused him

to develop cancer.  *See* 600 U.S. at 126.  Norfolk Southern sought dismissal for lack of personal

jurisdiction, emphasizing that it was a Virginia corporation with Virginia headquarters, and that

the plaintiff was in Ohio and Virginia while working for Norfolk Southern.  *See id.*  In a fractured

4-1-4 decision, five Justices rejected this argument and concluded that, on the facts of the case,

Pennsylvania's exercise of personal jurisdiction was consistent with the Due Process Clause's

requirement of fair play and substantial justice.  *See id.* at 143, 146 n.11 (plurality opinion); *id.* at

150 (Alito, J., concurring in part and concurring in the judgment).

The four-Justice plurality opinion relied principally on *Pennsylvania Fire Insurance Co.*
*of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), to justify

Pennsylvania's exercise of personal jurisdiction, *see Mallory*, 600 U.S. at 136-41 (plurality

opinion).  But it also emphasized that, at the relevant time:

> Norfolk Southern employed nearly 5,000 people in Pennsylvania.
> It maintained more than 2,400 miles of track across the
> Commonwealth.  Its 70-acre locomotive shop there was the largest
> in North America. … [T]he company even proclaimed itself a
> proud part of "the Pennsylvania Community."  By 2020, too,
> Norfolk Southern managed more miles of track in Pennsylvania
> than in any other State.  And it employed more people in
> Pennsylvania than it did in Virginia, where its headquarters was
> located.

*Id.* at 143 (citations omitted).  The plurality concluded by asking rhetorically, "Given all this, on

what plausible account could *International Shoe*'s concerns with 'fair play and substantial

justice' require a Pennsylvania court to turn aside Mr. Mallory's suit?"  *Id.*; *see also id.* at 146

n.11 ("While various separate writings accompany this opinion, it should be apparent a majority

of the Court today agrees that: … Exercising jurisdiction here is hardly unfair.").  Conversely, the

four dissenters argued that Pennsylvania's assertion of personal jurisdiction over Norfolk

Southern "clearly, palpably, and plainly violate[d] the Constitution" and its due-process

guarantee, and that "there is nothing reasonable about a State extracting consent in cases where it

has no connection whatsoever."  *Id.* at 165, 168 (Barrett, J., dissenting) (cleaned up).

Justice Alito concurred in part with the plurality opinion, providing the necessary fifth

vote in favor of the Court's judgment.  His position on the personal-jurisdiction issue is narrower

than the plurality's position and is therefore controlling.  *See Marks v. United States*, 430 U.S.

188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining

the result enjoys the assent of five Justices, the holding of the Court may be viewed as that

position taken by those Members who concurred in the judgments on the narrowest grounds."

(cleaned up)).  Justice Alito framed "[t]he sole question" before the Court as "whether the Due Process Clause of the Fourteenth Amendment is violated when a large out-of-state corporation with substantial operations in a State complies with a registration requirement that conditions the right to do business in that State on the registrant's submission to personal jurisdiction in any suits that are brought there."  *Mallory*, 600 U.S. at 150 (Alito, J., concurring in part and concurring in the judgment).  On this framing—and only on this framing—Justice Alito agreed with the other members of the majority that "the answer to this question is no."  *Id.*  Like the plurality (indeed, even more so), Justice Alito placed special emphasis on the breadth and depth of Norfolk Southern's business operations in Pennsylvania, describing it as "a large out-of-state corporation with substantial operations in [the] State" that "actively engaged in business" there. *Id.* at 150, 152.  On these facts, "[r]equiring Norfolk Southern to defend against Mallory's suit in Pennsylvania," Justice Alito explained, "is not so deeply unfair that it violates the railroad's constitutional right to due process": "The company has extensive operations in Pennsylvania; has availed itself of the Pennsylvania courts on countless occasions; and had clear notice that Pennsylvania considered its registration as consent to general jurisdiction.  Norfolk Southern's conduct and connection with [Pennsylvania] are such that [it] should reasonably anticipate being haled into court there."  *Id.* at 153 (cleaned up); *see also id.* ("At the least, *Pennsylvania Fire*'s holding does not strike me as 'egregiously wrong' in its application here.").

The facts here bear little resemblance to *Mallory*, and the differences are dispositive.  Unlike Norfolk Southern, HD HHI has no ongoing business in Pennsylvania, had no understanding or expectation that it could be subject to suit, and was surprised to learn that Petitioners believed they could assert personal jurisdiction over it from the other side of the world based on an unused 23-year-dormant corporate registration.  HD HHI is incorporated

16

under the laws of South Korea with its principal place of business in South Korea. Kim Decl. ¶ 39. It has no employees in Pennsylvania. *Id.* ¶ 5. HD HHI and its predecessor entities have received no revenues originating from Pennsylvania for at least the last 10 years, and its predecessor entities have not received any revenues originating from Pennsylvania associated with any current HD HHI business division since at least 2002. *Id.* ¶ 31.

The only reason the registration did not lapse years ago is that, until just recently, Pennsylvania had no requirement that foreign corporations reregister annually (or ever) in order for their registrations to remain active.[3] HD HHI is not aware of any actions taken by it or any predecessor entity to renew, amend, or file anything in connection with the registration. *See* Kim Decl. ¶¶ 25-26. And, through its multiple corporate reorganizations, at no point did HD HHI, or any other successor entity, update the unused Pennsylvania registration to reflect the changes in corporate structure or entity names. Likewise, the former employee who apparently filed the registration retired from Hyundai Heavy Industries Co., Ltd. in 2006, has not performed any work for the company since 2007, and has no memory of filing the registration. *Id.* ¶ 29. He never worked on any business connected to Pennsylvania during his time as the officer in charge of engineering in the Offshore Plant Division at Hyundai Heavy Industries Co., Ltd. *Id.* Unlike Norfolk Southern in *Mallory*, there is no reason to think HD HHI's predecessor company was ever required to file the registration with the Pennsylvania Secretary of State in the first place.[4]

---

[3]    A recently enacted Pennsylvania statute will change this regime beginning in 2027, requiring foreign corporations to file annual reports in order to maintain an active registration. *See* 15 Pa. Cons. Stat. § 146; *Annual Reports in Pennsylvania*, Commonwealth of Pennsylvania, https://www.pa.gov/agencies/dos/programs/business/types-of-filings-and-registrations/annual-reports (last visited Aug. 22, 2025).

[4]    *Cf. Mallory*, 600 U.S. at 148 (Jackson, J., concurring) ("Registration is required [in Pennsylvania] when corporations seek to conduct local business in a regular, systematic, or extensive way." (cleaned up)).

If the due-process limitation requiring "fair play and substantial justice" means anything, it should prevent HD HHI from being haled into a Pennsylvania court to answer discovery or claims relating to a ship that was built 10 years ago in South Korea, is owned and operated by entities based in Singapore, and struck a bridge in Maryland.  Simply put, HD HHI has "no meaningful contacts, ties, or relations" with Pennsylvania, as the Due Process Clause requires for the imposition of personal jurisdiction.  *Burger King*, 471 U.S. at 471-72 (cleaned up); *accord Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) ("Due process shields persons from the judgments of a forum with which they have established no substantial ties or relationship.").  Because asserting jurisdiction on these facts would be inconsistent with fair play and substantial justice, the Subpoena should be quashed.

### C.    Pennsylvania's Consent Requirement Violates The Dormant Commerce Clause

Even if this Court determines that applying Pennsylvania's registration statute here would not offend due process, the Subpoena should be quashed because Pennsylvania's consent-by-registration statute violates the dormant Commerce Clause.  "Although the [Commerce] Clause is framed as a positive grant of power to Congress, [the Supreme Court] ha[s] long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (cleaned up).  "This negative implication, referred to as the dormant Commerce Clause, prohibits states from engaging in undue economic protectionism." *Jean-Paul Weg LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 232 (3d Cir. 2025).  The question of whether Pennsylvania's statute requiring foreign corporations to consent to general jurisdiction in the Commonwealth violates the dormant Commerce Clause was expressly left open by the Court in *Mallory*.  *See* 600 U.S. at 127 n.3.  On the facts of this case, it clearly does.

Pennsylvania's registration statute violates the dormant Commerce Clause in two ways. *First*, it violates the Clause's prohibition on laws that discriminate against out-of-state companies. Where a statute "discriminates against interstate commerce," it "is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (cleaned up). Pennsylvania's jurisdictional scheme "discriminate[s] against out-of-state companies by forcing them to increase their exposure to suits on all claims in order to access Pennsylvania's market while Pennsylvania companies generally face no reciprocal burden for expanding operations into another State." *Mallory*, 600 U.S. at 161 n.7 (Alito, J., concurring in part and concurring in the judgment); *see Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984) ("A finding that state legislation constitutes economic protectionism may be made on the basis of discriminatory purpose *or* discriminatory effect." (quotation marks and citation omitted; emphasis added)). Here, there is no "*legitimate local* interest that is advanced by requiring an out-of-state company to defend a suit brought by an out-of-state plaintiff on claims wholly unconnected to the forum State" because "a State generally does *not* have a legitimate local interest in vindicating the rights of non-residents harmed by out-of-state actors through conduct outside the State." *Mallory*, 600 U.S. at 162-63 (Alito, J., concurring in part and concurring in the judgment). Therefore, the application of the consent-by-registration statute to HD HHI violates the dormant Commerce Clause.

*Second*, even if it does not expressly discriminate against out-of-state companies, Pennsylvania's registration statute violates the dormant Commerce Clause because "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Nat'l Pork Producers Council v. Ross*,

598 U.S. 356, 403 (2023) (Kavanaugh, J., concurring in part and dissenting in part) ("In today's fractured decision, six Justices of this Court affirmatively retain the longstanding *Pike* balancing test for analyzing dormant Commerce Clause challenges to state economic regulations."). Among other things, "the law imposes a significant burden on interstate commerce by requiring a foreign corporation to defend itself with reference to all transactions, including those with no forum connection." *Mallory*, 600 U.S. at 161 (Alito, J., concurring in part and concurring in the judgment) (cleaned up). "Aside from the operational burdens it places on out-of-state companies, Pennsylvania's scheme injects intolerable unpredictability into doing business across state borders." *Id.* And because there is "no legitimate local interest served, there is nothing to be weighed to sustain the law," let alone "sufficient local benefits" to "overcome the serious burdens on interstate commerce that it imposes." *Id.* at 163 (cleaned up).

## II.    The Subpoena Does Not Comply With Rule 45's Territorial Limitations

Even if the Court has personal jurisdiction over HD HHI, the Subpoena should be quashed because it does not comply with Rule 45's territorial limitations. Under Fed R. Civ. P. 45(c)(1)(A), "[a] subpoena may command a person to attend a … deposition only … within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed R. Civ. P. 45(d)(3)(A)(ii) requires a court to quash or modify a subpoena that "requires a person to comply beyond the geographical limits specified in Rule 45(c)." This requirement is not satisfied as to the Subpoena to HD HHI.

HD HHI does not reside or regularly conduct business in person within 100 miles of Philadelphia. Whether residence is examined as a matter of corporate registration, as it is under 28 U.S.C. § 1391 for purposes of venue, or by looking at where a corporation is at "home," as in the context of personal jurisdiction, there is no doubt that HD HHI and all of its employees that could or might be able to testify on its behalf do not reside within 100 miles of Philadelphia,

because they are all in South Korea.  Kim Decl. ¶ 5.  Similarly, neither HD HHI nor any of its corporate employees—including those qualified to testify as a corporate representative—regularly conducts business in person within 100 miles of Philadelphia.  *Id.*

These facts alone require that the subpoena be quashed.  *See In re Moose Enters. Pty. Ltd.*, 2016 WL 10987320, at *2 (C.D. Cal. June 2, 2016) ("Because Moose is an Australian company and because its employees live and work there and do not regularly travel here to conduct business, Eurofins cannot command the employees' deposition testimony in California with a Rule 45 subpoena."); *Hermitage Glob. Partners LP v. Prevezon Holdings Ltd.*, 2015 WL 728463, at *4 (S.D.N.Y. Feb. 19, 2015) (quashing Rule 45(c) subpoena addressed to company that "ha[d] minimal operations in the United States and no employees within 100 miles of the deposition site"); *Price Waterhouse LLP v. First Am. Corp.*, 182 F.R.D. 56, 61 (S.D.N.Y. 1998) ("Thus if the deponent is [the company] in that the territorial limitations apply only to it and not its partners or employees, Rule 45(c) requires the Subpoena to be quashed because it does not regularly transact business itself in New York; if, on the other hand, the 100-mile limitation applies to the actual individuals who would be forced to travel over 100 miles to be deposed, again the Subpoena must be quashed.").

## III.    The Subpoena Is An Improper Effort To Circumvent The Hague Convention

The Hague Convention provides an established means by which parties can seek discovery from foreign non-parties, and it should not be evaded without cause.  *See Seaton Ins. Co. v. Cavell USA*, 2007 WL 9657277, at *3 (D. Conn. Mar. 21, 2007) (criticizing litigant's "'transparent attempt'" to circumvent Hague Convention's requirements (quoting *Laker Airways Ltd. v. Pan Am. World Airways*, 607 F. Supp. 324, 326 (S.D.N.Y. 1985))).  Although the Hague Convention is not the only means of taking evidence of foreign corporations (at least in circumstances where a court otherwise has jurisdiction over those entities, *but see supra*

Argument § I), "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987).

Courts have adopted a list of factors discussed in *Aerospatiale* to analyze concerns of international comity when considering requests for foreign discovery. *See id.* at 544 n.28 ("[T]hese factors are relevant to any comity analysis"). These considerations are: "(1) the importance to the litigation of the documents or other information requested, (2) the degree of specificity of the request, (3) whether the information originated in the United States, (4) the availability of alternative means of securing the information, and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Ingenico Inc. v. Ioengine, LLC*, 2021 WL 765757, at *2 (D. Del. Feb. 26, 2021); *see also Arcelik A.S. v. E.I. DuPont de Nemours & Co.*, 856 F. App'x 392, 397 (3d Cir. 2021). Courts also consider "the [non-party] status of the person from whom discovery is sought." *Gap, Inc. v. Stone Int'l Trading, Inc.*, 1994 WL 38651, at *1 (S.D.N.Y. Feb. 4, 1994).

Here, all the factors cut against allowing Petitioners to circumvent the Hague Convention. *First*, as to the importance of the information, while it may have some bearing on the LoL Action, Petitioners certainly have not acted with the dispatch one would expect if the information were critical, as they waited until the eleventh hour to seek this discovery, even with the knowledge that Maryland had been engaging with HD HHI through the Hague Convention for months. And it is no excuse that Petitioners needed to wait until after HD HHI had responded to Maryland's requests—it is hardly a secret that HD HHI, as the shipbuilder, might have

information of potential relevance to the LoL Action.  Thus, to the extent Petitioners seek to rely on the short time to the close of fact discovery to allege that the options available under the Hague Convention are insufficient, that difficulty is entirely of their own making.  *Second*, the Subpoena seeks decade-old, highly technical information that will be difficult to collect and obtain after the passage of time and about which any witness will require extensive preparation prior to testifying.  *Third*, none of the information sought originated in the United States. *Fourth*, the Hague Convention is the alternate means of securing compliance that is (and has been) available to Petitioners.  *Fifth*, HD HHI is not aware of any state interests of either the U.S. or South Korea that would be implicated.  *Finally*, HD HHI's non-party status counsels in favor of requiring that Petitioners comply with the Hague Convention in seeing this information.

## IV.    The Subpoena Should Be Quashed Based On Its Improper Purpose And Other Prudential Considerations

The Subpoena should also be quashed because it is a transparent attempt to seek a preview of discovery in the separate lawsuit Petitioners have filed against HD HHI.  "In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which a party seeks information.  Thus, when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353, n.17 (1978); *see also In re Mushroom Direct Purchaser Antitrust Litig.*, 2009 WL 10736425, at *1 (E.D. Pa. Dec. 4, 2009) (quashing Rule 45 subpoena where the "clear … purpose" was to obtain documents for a mediation); *Harry F. Ortlip Co. v. George Hyman Constr. Co.*, 126 F.R.D. 494, 497-98 (E.D. Pa. 1989) (discovery not permitted for the purpose of developing information for a related arbitration).  Petitioners' lawsuit involves substantial questions related to personal jurisdiction, forum, arbitrability, and choice of law that will likely need to be addressed in any proceeding

that ultimately adjudicates the underlying dispute between the Petitioners and HD HHI.  HD HHI
intends to vigorously contest these issues—and the flawed substantive allegations in the
Complaint—in the appropriate forum and should not be compelled to turn over discovery to its
opponent before that litigation has even begun.  By requiring otherwise and forcing HD HHI to
participate in its current posture—that is, as a non-party to the LoL Action—the Subpoena places
an "undue burden" on HD HHI and must be quashed.  Fed. R. Civ. P. 45(d)(3)(A)(iv); *see also*
Fed. R. Civ. P. 26(c) ("The court may, for good cause, issue an order to protect a party or person
from annoyance, embarrassment, oppression, or undue burden or expense.").

In the current procedural posture, this Court is not well-positioned to resolve these
questions.  By way of example (beyond the jurisdictional issues discussed above), there are at
least three relevant agreements between one or more of the Petitioners and HD HHI, each
containing a choice-of-law provision and an arbitration provision.  *See* Kim Decl. ¶¶ 33, 36-37.
It is therefore possible that some or all the claims will end up resolved through arbitration, where
discovery options are typically far more limited.  Further, it is uncertain what law will apply to
the claims at issue: English law (as identified in the contracts between the parties), U.S. law (as
the law of the state where the allision occurred), or Korean law (as the law of the location where
the ship was built and HD HHI last had contact with the ship).  *See generally Calhoun v. Yamaha
Motor Corp.*, 216 F.3d 338, 345-46 (3d Cir. 2000) (laying out the choice-of-law analysis under
maritime jurisdiction).

It is no coincidence that the Complaint was filed only a matter of days after the
Petitioners attempted to serve the Subpoena on HD HHI.  Petitioners' attempt to obtain early
one-way discovery place an undue burden on HD HHI and should be rejected.

**CONCLUSION**

For the foregoing reasons, the Court should grant the motion to quash the Subpoena.

Respectfully submitted,

Dated:  August 22, 2025

/s/ *George P. Varghese*
George P. Varghese (Pennsylvania Bar No. 94329)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
George.Varghese@wilmerhale.com

Alan Schoenfeld (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Alan.Schoenfeld@wilmerhale.com

*Attorneys for Non-Party HD Hyundai Heavy
Industries, Co., Ltd.*